UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------X
KENNAN MCCLUNG AND ANDREW HALLINAN,

                               Plaintiffs,                **COMPLAINT**

        -against-

                                                  **Case No. _____**

THE CITY OF NEW YORK; NYPD OFFICER KANDOU
WORLEY; NYPD OFFICER CHRISTOPHER LEUFFGEN; NYPD
OFFICER JORGE PEREZ; NYPD OFFICER MACIEJ URBANSKI;
and NYPD MEMBERS JOHN AND JANE DOES 1-12,

                               Defendants.
-----------------------------------------------------------------------------------X

      Plaintiffs KENNAN MCCLUNG and ANDREW HALLINAN AND, by their attorneys,

COHEN & GREEN P.L.L.C., GIDEON ORION OLIVER, and WYLIE STECKLOW P.L.L.C.,

hereby complain of Defendants as follows:

## JURISDICTION AND VENUE

1. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the First, Fourth, and Fourteenth
   Amendments to the United States Constitution, and New York State and City law.

2. This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331, 1343,
   and 1367, and 42 U.S.C. § 1983.

3. Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Southern District of New
   York, where Plaintiff McClung resides, Defendant City of New York has offices, and the
   majority of the actions complained of herein occurred.

4. Plaintiffs timely served Notices of Claim on the municipal Defendant and complied with
   all conditions precedent to commencing an action under state law.

5.  At least thirty days have elapsed since service of Plaintiffs' Notices of Claim and adjustment and payment thereof has been neglected or refused.

6.  This action has been initiated within one year and ninety days of the accrual of Plaintiffs' claims pursuant to New York State Law.

## PARTIES

7.  At all times mentioned herein, Plaintiff ANDREW HALLINAN (Mr. Hallinan; he/him) was a resident of Kings County in the City and State of New York.

8.  At all times mentioned herein, Plaintiff KENNAN MCCLUNG (Mr. McClung; he/him) was a resident of New York County in the City and State of New York.

9.  At all relevant times mentioned herein, Defendant, City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

10. At all relevant times mentioned herein, NYPD Officer Kandou Worley was assigned Shield No. 5477, Tax Id. No. 945113, and Command 136. Defendant Worley participated in arresting and assaulting Plaintiff Hallinan on December 3, 2022, as detailed below. Defendant Worley's name appears on Plaintiff Hallinan's Desk Appearance Ticket as the Desk Officer.

11. At all relevant times mentioned herein, NYPD Officer Christopher Leuffgen was assigned Shield No. 11502, Tax Id. No. 960801, and Command 172. Defendant Leuffgen participated in arresting Plaintiff Hallinan on December 3, 2022, as detailed below.

Defendant Leuffgen's name appears on Plaintiff Hallinan's Desk Appearance Ticket as the Arresting Officer.

12. Plaintiffs do not currently know the names of Doe Defendants 1-4, but upon information and belief, their names are known to the defendants.

13. Plaintiff Hallinan only has the following descriptions:

   a. NYPD Members Does 1-4 all appeared to be white, and wore blue NYPD uniforms. All 4 Does assisted NYPD Member Worley in holding Plaintiff Hallinan face down on the hood of a car, then tightly handcuffed and arrested Plaintiff Hallinan.

14. Defendants NYPD Officer Kandou Worley, NYPD Officer Christopher Leuffgen, and NYPD Member John Does 1-4 are collectively referred to herein as the "Hallinan Defendants."

15. At all relevant times mentioned herein, NYPD Officer Jorge Perez was assigned Shield No. 13859, Tax Id. No. 959886, and Command 172. Defendant Perez participated in arresting and assaulting Plaintiff McClung on December 3, 2022, as detailed below. Defendant Perez's name appears on Plaintiff McClung's Desk Appearance Ticket as the Arresting Officer.

16. At all relevant times mentioned herein, NYPD Officer Maciej Urbanski was assigned Shield No. 21667, Tax Id. No. 935888, and Strategic Respond Group 4 Queens. Defendant Urbanski was the second NYPD member to put his hands on Plaintiff McClung and joined NYPD Member Perez in pushing and brutally attacking Plaintiff McClung.

17. Plaintiffs do not currently know the names of Doe Defendants 5-8, but upon information and belief, their names are known to the defendants.

18. Plaintiff McClung only has the following descriptions:

    a. John Doe Officer 5 was a plainclothes detective and appeared to be a white, middle-aged male. John Doe Officer 1 was the third person to put his hands on Plaintiff McClung and joined NYPD Member Perez in pushing and brutally attacking Plaintiff McClung.

    b. John Doe Officers 6-8 appeared to be white or white-passing males and wore blue NYPD uniforms with "Strategic Response Group" on the back of their jackets. Doe Officers 10-12 joined NYPD Member Perez in pushing and brutally attacking Plaintiff McClung.

19. Defendants NYPD Officer Jorge Perez, NYPD Officer Maciej Urbanski, and NYPD Member John Does 5-8 are collectively referred to herein as the "McClung Defendants."

20. Each individual Defendant is sued in his or her individual and official capacities.

21. The Defendants are NYPD members who unlawfully used excessive force, arrested, and/or detained Plaintiffs and others similarly situated in violation of their constitutional rights.

22. At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD. Some of their true names, as noted throughout this Complaint, are currently unknown to the Plaintiffs.

23. At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official

rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

24. Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

25. Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

26. Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

27. At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

28. Although there was a reasonable opportunity to do so, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

## STATEMENT OF FACTS

### PLAINTIFF KENNAN MCCLUNG'S EXPERIENCE ON DECEMBER 3, 2022

29. On December 3, 2022, Mr. McClung attended a protest at the intersection of Mott Street and East Houston Street, demonstrating as a clinic defender against an anti-abortion protest.

30. Mr. McClung arrived at the starting site of the protest, at or around 9:00 AM.

31. At the time of Mr. McClung's arrival, there were already NYPD members present. The street was open to the public.

32. As the anti-abortion protesters began to walk from the church to the family planning clinic, Mr. McClung and the clinic defenders faced them and walked in front of them to slow their progression to the clinic. There was a large presence of NYPD members walking with and parallel to the demonstrators.

33. The NYPD played an LRAD recording stating that the protestors must clear the roadway.

34. At that time, the majority of protestors, including Mr. McClung and both anti-abortion and clinic defenders were on the sidewalk, while most of the NYPD members present were in the roadway blocking vehicular traffic.

35. The anti-abortion protesters continued to march towards the local family planning clinic, eventually crossing Houston Street in the crosswalk and then continuing on the sidewalk.

36. The NYPD stopped playing the LRAD recording, and the NYPD members continued to walk in the roadway blocking vehicular traffic.

37. A majority of the anti-abortion protesters were on the west side of the sidewalk on Mott Street between Houston and Bleecker Street.  However, a few anti-abortion protesters, including members of the Red Rose Rescue, were on the east side of the sidewalk on Mott Street between Houston and Bleecker Street.

38. The northern end of Mott Street ends at Bleecker Street, and the local family planning clinic is located on the north-east corner of Mott and Bleecker Street.

39. Counter protesters, including Mr. McClung, were aware that these Red Rose Rescue members on the east side of Mott Street were approaching the entrance to the local family planning clinic.

40. Counter protesters, including Mr. McClung, were aware that these Red Rose Rescue members have a history of conduct of seeking to enter family planning clinics, being disruptive and stopping the clinic from operating until the Red Rose Rescue members are physically removed by law enforcement.

41. As the Red Rose Rescue members approached the entranceway to the family planning clinic, counter protesters, including Mr. McClung, sought to stand between the entrance and the Red Rose Rescue members, making it difficult for them to enter the clinic and disrupt the family planning clinic.

42. At that time, Inspector Nikas pointed at Mr. McClung and sent NYPD members onto the sidewalk to arrest him.

43. NYPD Member Jorge Perez suddenly and without warning, grabbed Plaintiff from behind.

44. NYPD Defendant Perez then forcefully shoved him down the sidewalk face-forwards.

45. NYPD Defendant Urbanski joined NYPD Defendant Perez in pushing and brutally attacking Plaintiff.

46. Doe Officer 5 was the third person to join in pushing and brutally attacking Plaintiff. At one point, Doe Officer 5 put Mr. McClung in a headlock and brutally threw Mr. McClung into the pavement face-first.

47. NYPD Defendant Perez, NYPD Defendant Urbanski, and John Doe Officers 5-8 then violently grabbed Mr. McClung, pushed him into the ground, and piled on top of him, pulling and yanking him in different directions.

48. All 6 NYPD members forced Mr. McClung into a face-down position and aggressively pulled on his arm while placing him in metal handcuffs.

49. NYPD members placed the metal handcuffs on Mr. McClung's wrist in an excessively tight manner, causing him to get cuts on his wrists.

50. Although Mr. McClung clearly and verbally informed the officers that his handcuffs were tight and causing pain, the officers blatantly ignored his request.

51. Ignoring complaints that cuffs are too tight violates written NYPD policy.

52. NYPD members also twisted Mr. McClung's arms in an unnatural way behind him during the handcuffing process, causing pain and stiffness in his shoulder.

53. NYPD Defendant Perez, NYPD Defendant Urbanski, and John Doe Officers 5-8 detained and seized Mr. McClung without consent, probable cause, or lawful justification.

54. After this brutal arrest, NYPD members loaded Mr. McClung into a prisoner transport vehicle, where he was held for 30-45 minutes.

55. The NYPD Members then took him to the 7th Precinct for processing.

56. Mr. McClung continued to ask for the loosening of his handcuffs due to the pain he was in, but his requests were ignored.

57. While in a cell at the precinct, Mr. McClung's requests for medical care and supplies for the abrasions sustained from his brutal arrest were refused or ignored.

58. At around 5:00 PM, NYPD Sergeant Kandou Worley issued Mr. McClung a Desk Appearance Ticket bearing Arrest No. M22646202, alleging that he had allegedly observed Mr. McClung violating New York Penal Law 205.30.

59. Upon information and belief, Defendant Worley included materially false factual allegations in the criminal complaint, which he knew to be false when he swore them out.

60. The Desk Appearance Ticket directed that Mr. McClung appear in New York City Criminal Court on December 22, 2022.

61. On December 9, 2022, the New York County District Attorney's Office declined to prosecute charges against Mr. McClung.

62. The Defendants' conduct directly and proximately caused physical and severe emotional injury to Mr. McClung.

**PLAINTIFF ANDREW HALLINAN'S EXPERIENCE ON DECEMBER 3, 2022**

63. On December 3, 2022, Mr. Hallinan attended a protest as a clinic defender at the intersection of Mott Street and East Houston Street in Manhattan, NYC.

64. Mr. Hallinan arrived at the site of the protest at or around 9:00 AM.

65. At the time of Mr. Hallinan's arrival, the street was open to the public and there were already NYPD members present.

66. As the anti-abortion protesters began to walk from the church, towards the abortion clinic, Mr. Hallinan documented as the clinic defenders maneuvered to walk in front of them to slow their progression to the clinic. There was a large presence of NYPD members walking with the demonstrators.

67. After the procession of anti-abortion protesters and counter-protesters crossed Houston Street on Mott Street, members of the Red Rose Rescue were on the east side of Mott

Street seeking to gain access to the family planning clinic in order to disrupt the facility and the services being provided at that time.

68. Mr. Hallinan observed Inspector Nikas point at Plaintiff McClung and direct NYPD members from the street to enter the sidewalk and arrest Mr. McClung.

69. Mr. Hallinan began to photograph and document Plaintiff McClung's arrest and the aftermath of the NYPD detaining Mr. McClung and removing him from the location.

70. Defendant Worley pushed Mr. Hallinan's camera away as he photographed.

71. Mr. Hallinan continued in his attempts to photograph the interaction between the NYPD and Mr. McClung. However, he could not see well and lifted his camera as high up as possible to continue to capture it.

72. Defendant Worley pushed the camera of the photographer standing next to Mr. Hallinan.

73. With the expectation of his camera being pushed again, Mr. Hallinan reached out to gently touch Defendant Worley's shoulder and get his attention.

74. As soon as Mr. Hallinan touched Defendant Worley's shoulder, Defendant Worley turned to him and, without warning, aggressively grabbed Mr. Hallinan.

75. Defendant Worley and Defendant Does 1-4 pushed Mr. Hallinan down the street, several feet away.

76. Defendant Worley and Defendant Does 1-4 then slammed Mr. Hallinan facedown into the hood of a car.

77. Defendants held down Mr. Hallinan with such force that Mr. Hallinan suffered a fracture to his rib.

78. Defendant Worley and Defendant Does 1-4 handcuffed Mr. Hallinan with excessively tight handcuffs, then walked him down the street to a police van.

79. Mr. Hallinan was eventually taken to the 7th Precinct for processing, where he was held for approximately 8-9 hours in custody.

80. Following this, NYPD Sergeant Kandou Worley issued Mr. Hallinan a Desk Appearance Ticket bearing Arrest No. M22646208, alleging that he had allegedly observed Mr. Hallinan violating New York Penal Law 240.26(1) by breaking free from the crowd, pushing Sergeant Worley with his hand, and then attempting to flee at 9:12 a.m. on December 3, 2022, at the northeast corner of Mott Street and East Houston Street.

81. The Desk Appearance Ticket directed that Mr. Hallinan appear in New York City Criminal Court on December 22, 2022.

82. Upon information and belief, Defendant Leuffgen included materially false factual allegations in the criminal complaint, which he knew to be false when he swore them out.

83. For example, as described above, Mr. Hallinan never pushed Sgt. Worley or attempted to flee.

84. The Defendants' conduct directly and proximately caused physical and emotional injury to Mr. Hallinan, including anxiety, pain to his wrists, and a fracture to his left rib.

**OTHER DOCUMENTS AND FACTS PLAINTIFF INCORPORATES BY REFERENCE**

85. Plaintiff incorporates by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[1]

---

[1] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

86. Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases in the United States District Court for the Southern District of New York arising from Defendants' responses to the summer 2020 protests, that have since settled, including:

    a. *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

    b. *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

    c. *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

    d. *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

    e. *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

    f. *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

    g. *Campbell v. City of New York,* 21-cv-04056 (AJN); and

    h. *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG).

**THE NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE AND OTHER, SIMILAR DEMONSTRATIONS**

87. The NYPD's violent response to the counter protest against anti-abortion protests that the plaintiffs participated in was dramatically different from their response to other kinds of protests and rallies.

88. On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[2]

---

[2] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

89. On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[3]

90. In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[4]

91. On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[5]

[3] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.
[4] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.
[5] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

92. On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her, and police threw her to the ground.[6]

93. On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[7,8]

94.  In fact, on the same date and at the same location as the arrest of the Plaintiffs, individuals associated with the Red Rose Rescue, a group identified by the New York State Attorney General as a "Militant Anti-Abortion Group" that invades clinics and blocks access to reproductive health, were also present at participating in the march and protest activity.[9]

[6] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[7] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[8] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

[9] https://ag.ny.gov/press-release/2023/attorney-general-james-sues-militant-anti-abortion-group-invading-clinics-and
, NYSAG announcing a lawsuit being filed against the Red Rose Rescue seeking to bar them from coming within 30 feet of any reproductive health care facility in New York State

95. However, on the date of the Plaintiffs' arrests the NYPD acted in a manner favoring those associated with the Red Rose Rescue group and treated them more favorably than they treated Plaintiffs.

96. The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.  By way of non-exhaustive example:

   a. In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

   b. In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[10,11]

   c. More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[12] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[13]

**THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS**

---

[10] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson
[11] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/
[12] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video
[13] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

97. The extensive deprivations of constitutional rights suffered by Plaintiffs here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, inter alia, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

98. The NYPD response to the protest of the anti-abortion demonstration was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

99. For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, and use of pepper spray.[14]

100.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests, and excessive and unreasonable detention.[15]

---

[14] *See,* e.g., N.Y. Civil Liberties Union, Arresting Protest (2003), available at https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[15] *See,* e.g., N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), available at https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.

101.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[16]

102.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers.[17]

103.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

104.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiff in this case.

105.    In many of these cases Defendants employed tactics developed and modified over the course of many years by former Commissioner Shea, former Chief Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

    a.  *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2)

---

[16] *See,* e.g., Callaghan v. City of New York, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[17] *See* People of the State of New York v. City of New York et al., 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

b. *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia,* that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

c. *Haus v. City of New York*, 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." See also *Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

d. *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as using extremely tight plastic handcuffs in their arrest;

e. *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and

denying defendants' cross-motion on false arrest claims);

f.  Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[18] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Peat et al v. City of New York, 12-cv-8230 (SAS)(HBP)* that included offers of judgment and attorney fees totaling $598,028, and which complaint had a similar failure to train Monell claim; *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions; and *Packard et al v. City of New York*, 15-cv-7130 (SDNY(AT)(SDA) that settled for a total payout including attorney fees of $980,000, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions.

g.  Other OWS-related cases have continued through discovery and are awaiting trial, including one case involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

h.  The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

i.  Those OWS-related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well as several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

j.  The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protest

---

[18] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

.pdf;

k.  The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf;

l.  The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

m.  *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

### THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING

106.    Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

107.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

108.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

109.    Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

110.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

111.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

112.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiff in this case.

113.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

114.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

115.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

116.    Defendants' failures to train, which led to violations of Plaintiff's rights in this case, include, *inter alia,* the following:

    a.   The failure to train, instruct, and discipline officers to discourage and prevent misconduct and assault by NYPD members;

    b.   The failure to make clear the need to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

    c.   The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies; and

    d.   The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters.

117.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

118.    The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

119.        The SRG has a unit in each of the five boroughs and the DCU has now been

incorporated into the SRG.

120.        In response to the public's skepticism that the SRG would be used to crack down

on protests, then-Chief of Department James O'Neill stated: "They will not be involved

in handling protests and demonstrations. They'll have no role in protests. Their response

is single fold. They'll be doing counter-terror work. They'll be assigned to different posts

throughout the city."[19]

121.  However, since 2015, the SRG has been regularly deployed at protests, including those

in 2020 related to the George Floyd protests, and the anti-abortion counter protests from

the present lawsuit.

122.  Many SRG members, including those deployed to the protest in this case, have histories

of engaging in the kinds of misconduct complained of herein, documented among other

places, by CCRB complaints, and in numerous lawsuits.[20]

123.  SRG members are meant to have additional DCU training.

124.  Upon information and belief, that additional DCU training is principally modelled on

the core principles and tactics in the Disorder Control Guidelines.

125.  However, the City of New York has admitted that many of the officers deployed to

respond to protests did not even receive *that* training, which was supposedly required of

them.

---

[19] Ben Yakas, NYPD: Fine, Maybe We Won't Police Protests With Machine Guns, Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.
[20] Ali Winston, NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct.

126.  As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protest was limited to what they had received as recruits in the Academy.[21]

127.  Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with disperse and demoralize while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

128.  Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

129.  For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY).[22]

---

[21] New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf at page 37.

[22] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

130.  Those reports praised employing militarized tactics to reach the goal of disperse and demoralize, such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests, like the Plaintiffs arrests on December 3, 2022, in order to have a "powerful psychological effect" on protesters.

131.  After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

132.  For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

133.  Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with First Amendment assemblies. These internal reports include Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

134.  Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

135.  For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a FRCP 30(b)(6) witness testifying as the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

136.  As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

137.  For example, in a 2017 FRCP 30(b)(6) deposition on (i) sidewalk policy protesting, (ii) dispersal orders, and (iii) training on probable cause standards for protest arrests, Defendant City of New York could identify any impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training related to protest policing.

138.  Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[23]

---

[23] OCC Report at 2, 30.

139.  At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiff and other similarly injured protesters.

**THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS**

140.  Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiffs.

141.  The use of force against the Plaintiffs were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

142.  Defendants used force that they knew, or should have known, would negatively impact Plaintiffs, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

**<u>FIRST CLAIM FOR RELIEF</u>**

**Unlawful Seizure / False Arrest**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

143.  Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

144.  Defendants' seizure of the Plaintiffs herein was done without any judicial warrant authorizing them to seize Plaintiffs, was unreasonable, and was done without privilege or lawful justification.

145.  Plaintiffs did not consent and were conscious of their confinement by Defendants.

146.  Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiffs.

147.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

148.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

149.  Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

150.  Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

151.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend

costs and expenses; and/or otherwise damaged and injured Plaintiffs.

152.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or

reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### First Amendment

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

153.  Plaintiffs incorporate by reference the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

154.  Defendants imposed restrictions on such protected speech and/or conduct that violated

Plaintiffs' First Amendment rights, including, but not limited to, in falsely arresting

Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and

regulations against Plaintiffs, and in otherwise violating Plaintiffs' rights and engaging in

the acts and omissions complained of herein.

155.  In addition to being retaliatory, the restrictions Plaintiffs complains of herein, which

Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe,

and/or stand nearby speech, conduct, association, and/or other expressive activities

protected by the First Amendment on the streets, were themselves regulations on

Plaintiffs' protected conduct that:

    a.  Were viewpoint discriminatory and/or otherwise not content-neutral, and were not

       necessary, and precisely tailored, to serve compelling governmental interests,

       and/or were not the least restrictive means readily available to serve those

       interests; or, alternately,

b.  Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiffs' protected expression, including in that Plaintiffs' abilities to communicate effectively were threatened; and/or

c.  Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.  Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

156.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

157.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## **FOURTH CLAIM FOR RELIEF**

### **First Amendment Retaliation**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First and Fourteenth Amendments to the United States Constitution***

158.  Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

159.  Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech, conduct, and/or associations.

160.  Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech, conduct, and/or associations.

161.  Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct and associations in the future.

162.  Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of their First Amendment rights.

163.  Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

164.  Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiffs.

165.  Additionally, some of the offenses charged against Plaintiffs, which Defendants might argue provided probable cause for Plaintiffs' arrest, were offenses that Defendants

typically exercise their discretion not to enforce, or not to make arrests in connection with.

166. Plaintiffs suffered actual chill, including in that Plaintiffs were prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

167. Additionally, in many cases, Defendants apparently permitted, acquiesced in, and/or facilitated the speech and/or other expressive conduct in which Plaintiffs were engaging, before suddenly using force and/or making arrests, without first having given reasonable notice that such force and/or arrest activity would result if Plaintiffs did not conduct themselves differently and/or disperse, as well as a meaningful opportunity to comply.

168. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiffs subjected Plaintiffs to the violations of their First Amendment rights described elsewhere herein.

169. As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

170. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Due Process

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution*

171.  Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

172.  As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on ad hoc determinations, often without fair warning.

173.  Additionally, as discussed elsewhere herein, Defendants City, including by its officials designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiffs' property and/or detaining Plaintiffs in the conditions as described subjected Plaintiffs to the violations of their Due Process rights described elsewhere herein.

174.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

175.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Equal Protection and Selective Enforcement

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution*

176.  Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

177.  As described above, on the date of the Plaintiffs' arrests, the defendants treated similarly situated individuals from the Red Rose Rescue differently.

178.  In the moments preceding the Plaintiffs' arrests, members of the Red Rose Rescue were on the same sidewalk as Plaintiffs.

179.  Members of the Red Rose Rescue were seeking to gain access to the door and entranceway of the family health clinic located on the same block where the arrests occurred.

180.  The defendants sought to facilitate the conduct of the members of the Red Rose Rescue in their free speech activities but sought to block the conduct of the Plaintiffs by arresting them and curtailing their free speech activities.

181.  Immediately prior to the arrests, members of the NYPD had been on the sidewalk seeking to support the Red Rose Rescue members in their free speech activities, and then Defendant Nikas gave an order for members of the NYPD to exit the sidewalk.  This order was maliciously done to cause and allow conflict between members of the Red Rose Rescue and other protesters present, including Plaintiffs, who supported access to the reproductive health facility.

182.  After pulling his subordinate officers off the sidewalk to allow the conflict to develop, Defendant Nikas – due to his dislike, hatred and ill will towards the Plaintiffs and other similarly situated protesters, ordered his subordinate officers back onto the sidewalk to

arrest Plaintiffs, curtailing their free speech activities, while allowing members of the Red Rose Rescue to continue in their free speech activities.

183.  Defendant Nikas support for individuals who disfavor abortion rights, such as Red Rose Rescue, is well-known.  In November 2022, when the group seeking to march and protest against reproductive rights, Witness for Life, was denied a permit, Nikas still led a large contingency of police officers to protect Christopher Fidelis Moscinski (an individual known to enter reproductive health clinics in order to disrupt the clinic) as he marched from the Basilica of St Patrick's Old Cathedral to the reproductive health facility[24].

184.  Defendant Nikas dislike for protesters is well documented.   He has often been named as a defendant in lawsuits by protesters, but even more obvious is his attempt to chill protesters rights. As an example, two days after Nicolle Besuden was arrested at a George Floyd protest, Nikas approached her in the street asking her "How was the beach?"  Her attorney, Tahanie Aboushi explained that the NYPD were tracking Ms. Besuden's movements in retribution for her continued participation in protest, and this statement by Nikas was because, "He intended to intimidate her, to harass her, to let her know she is being watched."[25]  Ms. Besuden's lawsuit settled for $150,000, 21-cv-08452.

185.  A CCRB complaint against Nikas for abusing his authority while policing protests was sustained and published publicly as part of a large CCRB report concerning misconduct during the summer 2020 protests.[26]  This was not the first substantiated claim by the CCRB against Nikas.

---

[24] https://www.instagram.com/p/CkoDy4juXzz/?next=%2Fsums12%2F&hl=ms&img_index=6
[25] https://patch.com/new-york/new-york-city/nypd-used-instagram-stalk-blm-protester-lawsuit-says
[26]
https://www.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/Protest%20Data%20Snapshot%20June%20
2021.pdf

186.  Defendant Nikas was sued for assaulting a photographer documenting a protest and jabbing him in the eye.  That suit was settled for $200,000, *Hassab El Nabi, Abdelrahman v. City of New York*, 23-cv-03768.

187.  Upon information and belief, on June 1, 2020, Nikas was part of a team of police officers that knocked a peaceful protester Oscar Rios to the ground near Port Authority, forced Mr. Rios to lie prostrate on the ground, struck him multiple times with a baton, and ignored his complaints of being unable to breath.  Mr. Rios was a class action representative in *Sow v. City of NY,* 21-cv-533, and helped obtain what has been hailed as the largest class action protest settlement in U.S. history.

188.  As discussed elsewhere herein, Defendant City, through officials such as Defendant Nikas, designed and/or implemented policies and practices pursuant to which members of the NYPD, including Defendant Nikas and others, ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiffs, thereby subjecting Plaintiffs to the above-described violations of Plaintiffs' Equal Protection rights.

189.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

190.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution***

191.  Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

192.  Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiffs suffered liberty deprivations and other injuries.

193.  Defendant Leuffgen knowingly and intentionally transmitted false information to the New York County District Attorney by swearing in a criminal complaint that Plaintiff Hallinan was observed "break(ing) from the crowd and push Sergeant Worley with his hand and then attempt to flee."

194.  This statement was untrue, was communicated to a prosecutor, and was likely to influence the decision of any jury weighing the evidence presented in a prosecution of Plaintiff.

195.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

196.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### <u>EIGHTH CLAIM FOR RELIEF</u>

**Malicious Prosecution**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution***

197.  Plaintiffs incorporate by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

198.  Upon information and belief, Defendants misrepresented and falsified evidence to the prosecutor and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence - to the prosecutor.

199.  Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiff Hallinan, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, and/or providing false information to the prosecutor.

200.  Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiff Hallinan.

201.  Defendants acted with malice in initiating criminal proceedings against Plaintiff Hallinan.

202.  Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiff Hallinan was favorably terminated on the merits.

203.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiff Hallinan of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

204.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## NINTH CLAIM FOR RELIEF

***Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)***

***for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution***

205.  Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

206.  The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including, but not limited to: disperse and demoralize tactics, uses of excessive force, unlawful detention, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; viewpoint discrimination; violation of equal rights; using overtight metal cuffs for protest-related arrests, failing to loosen or remove over-tight cuffs; and, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

207.  As set out above, Defendants arrested Plaintiffs entirely without probable cause.

208.  All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking officials; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, through its policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## TENTH CLAIM FOR RELIEF

### Violation of New York City Administrative Code § 8-802

**Deprivation of Rights**

209.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

210.     The acts of Defendant Officers constituted conduct under color of the laws of the State of New York, under color of the laws, rules, and regulations of the City of New York, and under color of the customs and usages of the City of New York and of the New York City Police Department.

211.     The acts of Defendant Officers caused Plaintiffs to be deprived of their rights, as they are granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802, to be secure in their person against unreasonable search and seizure.

212.     The acts of Defendant Officers caused Plaintiffs to be deprived of their rights, as they are granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802, to be secure in their person against the use of excessive force in connection with Defendants' search and seizure of Plaintiffs.

213.     The Defendant Officers, while in uniform, unlawfully seized, searched and arrested the Plaintiffs in violation of N.Y.C. Admin. Code §§ 8 – 802.

214.     As a result of the foregoing, Plaintiff s were deprived of their liberty, were denied fundamental constitutional rights, were publicly embarrassed and humiliated, were caused to suffer severe emotional distress, were incarcerated and forced to incur legal expenses and costs to defend themselves and obtain their liberty, was caused to feel unwell during the arrest processing and suffered embarrassment and pain and suffering during and due to their arrests.

215.     As a result of the above conduct, the City of New York is liable, under New York City Administrative Code § 8-803(b) and under the doctrine of respondeat superior, for the conduct of the Individual Defendants, and for any damages the Individual Defendants caused by and through their conduct.

**ELEVENTH CLAIM FOR RELIEF**

**Violation of New York City Administrative Code § 8-803**
**Failure To Intervene**

216.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

217.     The acts of all Defendant Officers constituted conduct under color of the laws of the State of New York, under color of the laws, rules, and regulations of the City of New York, and under color of the customs and usages of the City of New York and of the New York City Police Department.

218.     The failure of Defendant Officers to intervene, in violation of N.Y.C. Admin. Code § 8 – 803, caused Plaintiff to be deprived of their rights, as they are granted and guaranteed to them by N.Y.C. Admin. Code § 8 – 802, to be secure in their person against unreasonable search and seizure.

219.     The failure of Defendant Officers to intervene caused Plaintiffs to be deprived of their rights, as they are granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802, to be secure in their person against the use of excessive force in connection with Defendants' searches and seizures of Plaintiffs.

220.     The failure of the Defendant Officers to intervene while other Defendant Officers unlawfully seized, searched and arrested the Plaintiff, caused Plaintiffs to be deprived of

the right to be secure against such illegal acts as it is granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802.

221.    As a result of the foregoing, Plaintiffs were deprived of their liberty, were denied fundamental constitutional rights, were publicly embarrassed and humiliated, were caused to suffer severe emotional distress, were incarcerated and forced to incur were incarcerated and forced to incur legal expenses and costs to defend themselves and obtain their liberty, were caused to feel unwell during the arrest processing and suffered embarrassment and pain and suffering during and due to their arrests.

222.    As a result of the above conduct, the City of New York is liable, under New York City Administrative Code § 8-803(b) and under the doctrine of respondeat superior, for the conduct of the Individual Defendants, and for any damages the Individual Defendants caused by and through their conduct.

## <u>TWELTH CLAIM FOR RELIEF</u>

### *Violations of New York Civil Rights Law § 79-P Right To Record*

223.    Plaintiffs hereby reallege and incorporate by reference all of the preceding paragraphs as though they were fully set forth herein.

224.    Prior to his assault, battery, and arrest, Plaintiff Hallinan was exercising his rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity.

225.    In arresting Plaintiff Hallinan, the Hallinan Defendants and the Municipal Defendants exceeded their authority because their conduct was inconsistent with New York Civil Rights Law § 79-P and the Federal Constitutional.

226.    All Defendants violated New York Civil Rights Law § 79-P in that Plaintiff

Hallinan was arrested while he "exercised or attempted to exercise the right established in subdivision two of this section to record a law enforcement activity and an officer acted to interfere with that person's recording of a law enforcement activity" in one of the specified ways.

227.    Defendants unlawfully arrested Plaintiff Hallinan to deter him from exercising his right to record law enforcement activity.

228.    New York Civil Rights Law § 79-P creates a private right of action that explicitly provides for punitive damages and injunctive relief, as well as mandatory attorneys' fees and expert fees.

229.    New York Civil Rights Law § 79-P defines "record" and the related right in extremely broad terms.

230.    Specifically, the law creates a right of action to sue for any law enforcement interference with the right, including "attempting to prevent [a] person from recording law enforcement activity." New York Civil Rights Law § 79-P(3)(i); *see also, id* § (iv).

231.    Similarly, there is a cause of action where an officer — regardless of the fact of recording — engages in "commanding that the person cease recording law enforcement activity when the person was nevertheless authorized under law to record, as happened here. New York Civil Rights Law § 79-P(3)(iii).

232.    Thus, the statute creates a right of action, and that right — like the similar First Amendment right — "does not depend on whether [a plaintiff's] attempt to videotape was frustrated" (*Gericke v. Begin*, 753 F.3d 1, 3 n.2 (1st Cir. 2014)), or for that matter, only intended to create the *impression* someone was recording.

233.    Defendants' actions and policies alike violate New York Civil Rights Law § 79-P

such that all the remedies available thereunder are appropriate.

## THIRTEENTH CLAIM FOR RELIEF

### *Violations of New York City Administrative Code*
### *Right To Record § 14-189 Police Activities*

234.    Plaintiffs hereby reallege and incorporate by reference all of the preceding paragraphs as though they were fully set forth herein.

235.    Prior to the assault, battery, and arrest, Plaintiff Hallinan was exercising their rights under New York Civil City Administrative Code § 14-189, the Right to Record Police Activities.

236.    In arresting Plaintiff Hallinan, all Defendants, including the Municipal Defendants, exceeded their authority because their actions were inconsistent with New York Civil City Administrative Code § 14-189.

237.    All Defendants violated New York Civil City Administrative Code § 14-189 in that Plaintiff Hallinan was arrested while he "recorded or attempted to record police activities in accordance with subdivision b and an officer interfered with such person's recording of police activities" in one of the specified ways.

238.    Defendants unlawfully arrested Plaintiff Hallinan to deter him from exercising his right to record law enforcement activity.

239.    New York Civil City Administrative Code § 14-189 creates a private right of action that explicitly provides for punitive damages and injunctive relief, as well as attorneys' fees and expert fees.

240.    New York Civil City Administrative Code § 14-189 defines "record" and the related right in extremely broad terms.

241.     Specifically, the law creates a right of action to sue for any law enforcement interference with the right, including "interfer[ing] with such person's recording of police activities."  New York Civil City Administrative Code § 14-189(c)(1).

242.     Similarly, there is a cause of action where an officer — regardless of the fact of recording — engages in "stopping, seizing, searching, issuing any summons, or arresting any individual because such individual recorded police activities," as happened here. New York Civil City Administrative Code § 14-189(c)(1)(a-c).

243.     Thus, the code creates a right of action.

244.     Defendants' actions and policies alike violate New York Civil City Administrative Code § 14-189 such that all the remedies available thereunder are appropriate.


## FOURTEENTH CLAIM FOR RELIEF

### *Violations of New York State Law Pursuant to the New York State Constitution and New York State Common Law*

245.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

246.   The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of respondeat superior.

### Violations of the New York State Constitution

247.   Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

248.  A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9,

11, and 12 of the New York State Constitution, and appropriate to ensure full realizations

of Plaintiff's rights under those sections.

## Assault

249.  Defendants committed assault within the meaning of New York common law against

Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive

contact.

## Battery

250.  Defendants committed battery within the meaning of New York common law against

Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

## False Imprisonment and Unreasonable Detention

251.  By the actions described above, the police officials described above did falsely arrest

and/or imprison Plaintiffs within the meaning of New York common law without

reasonable or probable cause, illegally and without a written warrant, and without any

right or authority to do so. Plaintiffs were conscious of the confinement, and it was

without their consent.

## Intentional and Negligent Infliction of Emotional Distress

252.  Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs

as if fully set forth herein.

253.  By the actions described above, Defendants engaged in extreme and outrageous

conduct, which intentionally and/or negligently caused severe emotional distress to

Plaintiffs.

254.  The acts and conduct of the Defendants were the direct and proximate cause of injury and damage to Plaintiffs and violated their statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

255.  As a result of the foregoing, Plaintiffs was deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

### Negligent Training and Supervision

256.  Upon information and belief, Defendant City supervised, and trained the police officials described above.

257.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### Excessive Detention

258.  Defendants deliberately detained Plaintiffs for an excessive and unreasonably prolonged period of time.

### Malicious Prosecution

259.  Defendants commenced criminal proceedings against Plaintiffs maliciously and without probable cause.

260.  As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

261.  The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

262.  Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

263.  WHEREFORE, Plaintiffs demand judgment against the individual Defendants and the

City of New York as follows:

   e.  Actual and punitive damages against the individual Defendants in an amount to be

   determined at trial;

   f.  Actual damages in an amount to be determined at trial against the City of New

   York;

   g.  Injunctive and declaratory relief, including under the New York City

   Administrative Code;

   h.  Statutory attorney's fees, expert fees, disbursements, and costs of the action

   pursuant to, *inter alia*, 42 U.S.C. §1988, New York State Law, the New York City

   administrative code, and New York common law; and

   i.  Such other relief as the Court deems just and proper.

Dated: Brooklyn, New York
       March 5, 2024

                                        **GIDEON ORION OLIVER**


**WYLIE STECKLOW PLLC**

                                        277 Broadway, Suite 1501
                                        New York, NY  10007
                                        t: 718-783-3682
                                        f: 646-349-2914
_____                 Gideon@GideonLaw.com

Wylie M. Stecklow                       **COHEN&GREEN P.L.L.C.**

Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019
(212) 566 8000
ECF@WylieLAW.com

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿
     Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
  t: (929) 888-9480
  f: (929) 888-9457
  e: elena@femmelaw.com
    remy@femmelaw.com
    jessica@femmelaw.com


Wylie M. Stecklow
Carnegie Hall Tower
152 W. 57th Street, 8th Floor
New York, NY 10019
(212) 566 8000
ECF@WylieLAW.com